1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                  **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   STEVEN DIAZ,                         No. CIV S-05-0376-MCE-CMK-P

12                  Petitioner,

13          vs.                            <u>FINDINGS AND RECOMMENDATIONS</u>

14   DERRAL ADAMS,

15                  Respondent.

16   _____/

17          Petitioner, a state prisoner proceeding with appointed counsel, brings this petition

18   for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the court are

19   petitioner's pro se petition for a writ of habeas corpus (Doc. 1), filed on February 25, 2005,

20   respondent's answer (Doc. 14), filed on December 15, 2005, and petitioner's reply (Docs. 24 and

21   25), filed by appointed counsel on March 27, 2006.

22          On December 28, 2007, the court granted petitioner leave to take the deposition of

23   trial counsel, Jon Lippsmeyer.  Mr. Lippsmeyer's deposition was taken on February 13, 2008,

24   and the transcript has been lodged with the court.  Also before the court are:  (1) respondent's

25   objections (Doc. 38) to petitioner's request (Doc. 36) for leave to lodge the deposition transcript

26   one day late; (2) petitioner's response (Doc. 39) to respondent's objections; (3) petitioner's

1

1  motion (Doc. 40) for additional discovery; and (4) respondent's opposition (Doc. 42) to

2  petitioner's request for additional discovery.

3          The court finds that additional briefing is not necessary and the matter was

4  submitted on February 26, 2008.

5

6                              **I.  BACKGROUND**

7      **A.     <u>Facts</u>**[1]

8          The state court recited the following facts, and petitioner has not offered any clear

9  and convincing evidence to rebut the presumption that these facts are correct:

10          Defendant was . . . charged with three counts against Anita V.:
       forcible rape . . ., kidnap with intent to commit rape . . ., kidnapping . . .,
11     and false imprisonment. . . .  The jury found defendant guilty of these
       crimes.  The jury also found true special allegations that defendant
12     kidnapped the victim within the meaning of [California Penal Code]
       section 667.61, subdivisions (e)(1) and (h), and 667.8.  In addition,
13     defendant admitted allegations that he had a prior conviction within the
       meaning of section 667, subdivision (a), and section 667, subdivisions (b)-
14     (I), and had two prior convictions within the meaning of section 667.5,
       subdivision (b).  Defendant was sentenced to state prison for 30 years to
15     life plus seven years.
           Anita V. testified she was parked in her car on Stockton Boulevard
16     at 4:30 a.m. on February 10, 1996, when defendant approached her car
       carrying a black Chow puppy.  The location is a stroll area for prostitutes.
17     Anita had her head down on the steering wheel and was crying.  She had
       many unopened condoms in her purse.
18         After inquiring whether she was all right, defendant asked Anita
       for a ride to 10th Street.  Defendant gave her various directions, telling her
19     to stop at a house, leave, and then to keep driving.  Ultimately, he told her
       to stop in front of a house where he became very aggressive.  He forcibly
20     kissed her, tried to thrust his tongue down her throat, put his hand up her
       bra, and tried to kiss her breasts.  She resisted.  He then got out of the car,
21     pulled Anita out by her hair, and forced her into a shed behind a residence.
       The shed was approximately 12 feet from the parked car.

22

23
   _____

24        [1]      Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made
   by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this
25 presumption by clear and convincing evidence.  <u>See id.</u>  These facts are, therefore, drawn from
   the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as
26 "defendant."

Defendant threatened to have his friends come out of the house and beat her up if she cried out for help.  He put a sheet down, ordered her to take off her clothes, and then raped her.  He was arrested later that morning with the Chow puppy.  Anita identified defendant as the assailant in a field identification that morning, in a photographic lineup, and at trial. The police found a sheet in the shed.

Semen, consistent with defendant's blood type, was removed from Anita's cervix and vagina during a forensic examination.  The examining nurse also noticed a brownish-yellow mucous outside the vaginal opening. A penile swab taken from defendant later that morning tested positive for the presence of semen.

Anita claimed she was not a prostitute and was not aware she was in a prostitute stroll area.

Defendant testified to a very different version of the same basic story.  According to defendant, he approached Anita's car when he saw her with her head on the steering wheel and became concerned.  She asked him to do her a favor and "sex her up" for $40.  Defendant agreed but would not pay her in advance.  They drove to 10th Street because Anita's aunt lived there.  They began kissing in the car in front of her aunt's house but defendant became uncomfortable and asked Anita to leave.  They parked in front of the house of one of his friends.  Again, they began kissing in the car, but defendant did not want to have sex in the car.

They went into the shed.  He put a sheet on the ground and lay down.  When Anita took off her pants, defendant smelled a strong, offensive odor and, concerned he would contract a disease, decided not to have sex with her.  He asked her to take him back to 10th Street.  Once there, he left without paying her.

**B.**    **Procedural History**

Petitioner was convicted following a jury trial and sentenced to 30 years in prison, plus seven years for the prior convictions.  On direct appeal, the government conceded that petitioner's convictions for kidnapping and false imprisonment should be reversed because they are necessarily included within the greater offense of aggravated kidnapping.  Otherwise, the California Court of Appeal affirmed the judgment.  Petitioner filed a habeas corpus petition in the California Supreme Court, which denied relief without comment or citation.

**C.**    **Fact Development and Evidentiary Issues**

As indicated above, the court granted leave to take the deposition of trial counsel, Jon Lippsmeyer, which occurred on February 13, 2008.  This was prompted by petitioner's reference to a report submitted to the state court by Robert D. Blasier.  Mr. Blasier was appointed by the Sacramento County Superior Court "to investigate and, if appropriate, file a motion for

1    DNA testing. . . " as part of the post-conviction review process.   On July 31, 2003, Mr. Blasier

2    submitted his report to the presiding judge.   The report is attached to petitioner's petition at

3    Exhibit B and his reply brief as Exhibit A.   Thus, Mr. Blasier's report and Mr. Lippsmerer's

4    deposition testimony are before the court in these proceedings.

5            In addition, petitioner's counsel attached to his request for leave to lodge the

6    deposition transcript one day late a report from investigator Terry M. Butrym.   This document is

7    attached to petitioner's request as Exhibit C.   Also before the court is respondent's objections to

8    Mr. Butrym's report, as well as objections to Mr. Blasier's report.   Finally, petitioner has

9    requested leave to conduct additional discovery.   Specifically, petitioner seeks leave to take the

10   deposition of Mr. Blasier in order to impeach Mr. Lippsmeyer's testimony.   He also seeks to have

11   portions of the state court trial transcript containing his testimony and Mr. Lippsmeyer's closing

12   argument lodged with this court.

13           1.    <u>Mr. Blasier's Report</u>

14           Mr. Blasier indicates in this report that he interviewed petitioner's trial counsel as

15   part of preparing his report.   He notes the following facts concerning the prosecution's case:

16                   The prosecution presented evidence at the trial as to the match
                 between Mr. Diaz's blood type and the blood type of the perpetrator.
17               However, it was acknowledged that this blood type is very common,
                 appearing in as much as 33% of some populations.

18

19   As to the defense, Mr. Blasier states in his report:

20                   Mr. Diaz testified on his own behalf.   He stated he was on SSI,
                 with his mother acting as conservator.   He lives with his mother.   His
21               mother has to take care of him, because he is a "little bit" retarded.

22                   Mr. Diaz agreed that he walked up to . . .  [the victim's] car when
                 he saw her with her head on the steering wheel.   He knocked on her
23               window and asked what was wrong.   [The victim] said nothing was wrong.
                 He asked [the victim] for a ride and she said to get in.   They sat in the car
24               and talked for a few minutes.

25                   [The victim] asked him to do her a favor and let him "sex her up"
                 for $40.   Mr. Diaz agreed to pay this amount for sex, but told [the victim]
26               he did not want to pay up front because he had been burned before.   They

                                            4

drove to 10th Street because [the victim] said her aunt lived there.  Once there, they made out in the car.  He french kissed and rubbed [the victim], and she did not protest.  He became uncomfortable and asked her to drive somewhere else, because he was afraid some of her friends might come out of her aunt's house and mug him.

He directed her to drive to one of his friends' house.  Mr. Diaz did not want to have sex in the car so he and [the victim], with [the victim] in agreement, went to a shed behind his friend's house.

In the shed, Mr. Diaz put a sheet on the ground.  He laid down with his clothes on.  [The victim] got on top of him and started going up and down on him.  H[is] penis started to become erect, and [the victim] started taking her clothes off.  She had agreed to raise the price if he did not wear a condom.

Mr. Diaz took off his pants, but never removed his underwear or exposed his penis.  When [the victim] took off her pants, Mr. Diaz smelled a strong odor.  [The victim] was discharging a "smelly yellow stuff" from her vagina onto her panties and all over Mr. Diaz's pants.  Mr. Diaz testified he felt uncomfortable and stopped his activities because he thought "she had a disease."  He told [the victim] to put her clothes back on and that he would pay her if she would take him back to 10th Street. Once they arrived at 10th Street, he took off without paying her.

Mr. Diaz said they had "sex," which he considered to include kissing and "her going up and down on me [and] . . . fondling on a girl and her, you know, getting hot and that."  [¶]  However, he did not penetrate her.  He did not ejaculate in [the victim], and only a little sperm came out while she was rubbing up and down on him.  That sperm would have stayed in his underwear.

Mr. Blasier did not cite to any specific portions of the trial transcript in support of this description of the defense version of the facts.  As to the semen evidence available at the time of petitioner's trial, Mr. Blasier stated:

No DNA testing was performed on the semen found in the victim's vagina or on her panties.  The prosecution did not ask to have the semen tested for DNA.

Defense counsel did not request DNA testing even though the entire defense rested on showing that the alleged victim was lying. . . . Mr. Diaz adamantly denied that he had sex with [the victim].  A DNA test on the semen found in [the victim] would have definitively determined if Mr. Diaz was telling the truth or not.  If testing showed that the semen found in [the victim's] vagina was <u>not</u> from Mr. Diaz, it would have proved that Mr. Diaz was telling the truth and that [the victim] lied about . . . not having sex with anyone else within the prior 72 hours.

5

1          * * *

2          Trial counsel had no explanation for why he did not pursue this
          prior to the time of trial.  He did agree, however, that DNA testing, if it
3          confirmed Mr. Diaz's statement, would have been very strong exculpatory
          evidence.
4

5    While Mr. Blasier concluded that post-conviction DNA testing would be appropriate in

6    petitioner's case, he could not proceed with filing a motion for such testing because biological

7    evidence was no longer available.

8          Respondent objects to Mr. Blasier's report as containing hearsay to the extent it is

9    offered for the truth of matters stated by Mr. Lippsmeyer to Mr. Blasier.  The court agrees that,

10   for this purpose, it is hearsay.  See Fed. R. Evid. 801(c).  The report is also hearsay as to the truth

11   of any statements made to Mr. Blasier by petitioner.  See id.  However, the report is not hearsay

12   to the extent it is not being offered to prove the fact of matters stated by Mr. Lippsmeyer but,

13   rather, is offered to impeach his deposition testimony – which was subject to cross-examination –

14   with evidence of prior inconsistent statements.  See Fed. R. Evid. 801(d)(1).  In this regard, the

15   only statements reported by Mr. Blasier attributable to Mr. Lippsmeyer are Mr. Lippsmeyer's

16   statement to the effect that:  (1) he had no explanation for why he did not conduct DNA testing;

17   and (2) he agreed that DNA testing would have been very strong exculpatory evidence if it

18   confirmed petitioner's testimony.[2]

19          2.   Mr. Butrym's Report

20          Mr. Butrym prepared a report for petitioner's habeas counsel following his

21   interview of Mr. Blasier.  Specifically, Mr. Butrym reports:

22          **BLASIER** stated that he spoke with **LIPPSMEYER** prior to
          writing the report dates 07/31/2003.  He stated that he had been advised by
23          **LIPPSMEYER** that his (**LIPPSMEYER**) defense was based on the fact
          that his (**LIPPSMEYER**) client **DIAZ** had advised him (**LIPPSMEYER**)

24

---

25          [2]     Mr. Blasier is not precise in his report as to what testimony DNA testing would
     support.  It could be that Mr. Blasier thought DNA testing would support petitioner's testimony
26   that the victim agreed to sex or that there was no penetration.

6

that he (**DIAZ**) had never penetrated the victim.  He stated that if there
was no penetration then there was no rape; he stated that **LIPPSMEYER**
stated and he agreed that because there was no penetration it would have
been appropriate to do a DNA analysis on the seamen [sic] found inside
the victim.

Respondent objects that this is triple hearsay – Butrym's statement of Blasier's statement of

Lippsmeyer's statement.  The court agrees.  In any event, the report from Mr. Butrym provides

nothing new.  It is essentially a restatement of what Mr. Blasier said.

    3.    Trial Transcripts

        Petitioner requests that portions of the trial transcript containing his testimony and

Mr. Lippsmeyer's closing argument be lodged with the court.  Given that the complete transcript

has already been lodged with respondent's answer, the request is moot.[3]

        The record reflects that petitioner's testimony on direct examination was generally

as reported by Mr. Blasier.  Of note is the following testimony regarding consent:

        Q:    Okay.  Did you do anything else?

        A:    I rubbed on her, and she rubbed on me, and then – then
wanted to go, because I wasn't feeling comfortable, think I was –

        Q:    Okay.  Did she say anything to you then in terms of saying
no or not – anything about not kissing her at that point?

        A:    No.  No.

        * * *

        Q:    Okay.  So was it your idea to go somewhere else, or was it
her idea?

        A:    It was both our ideas.

        * * *

        Q:    In terms of going into the shed, did one of you go first?
Did you go together?  How did you walk to the shed – or did you walk to
the shed?
        Let's start out, did you walk to the shed?

_____

        [3]    The transcript of petitioner's trial testimony is also attached to Mr. Lippsmeyer's
deposition transcript.

1        A:     Yeah, we walked to the shed together.

2        Q:     Okay.  Did you go first, or did she go first?

3        A:     I went in there first.  She followed right behind me.  She
4 was right behind me.

5 As to penetration, the following exchange took place on cross-examination:

6        Q:     Okay.  Now, it's my understanding from your testimony on
  direct that your penis never got out of the – your clothing while you were
7 with [the victim]; is that correct?

8        A:     Yes.

9        Q:     So you never placed your penis into her vagina?

10       A:     No.

11       Q:     Never made penetration?

12       A:     No.

13       Q:     Never ejaculated in her?

14       A:     No.

15       Q:     Did you tell Detective Carlson something differently?

16       A:     No.

17       Q:     At what point did Detective Carlson ask you, "When you
  put your penis in her vagina, did you have a full erection," did you answer,
18 "Yeah" to that question?

19       A:     I don't think – I don't know.  I just said we had sex, and the
  sex I was indicating was that I had my clothes on, not intercourse sex.  The
20 sex just going up and down on top of me.  That's what –

21       Q:     Did you ever –

22       A:     – that's my indication of sex.

23       Q:     Did Detective Carlson ask you, "Did you put your penis all
  the way inside her," and you answered "Yeah"?
24

25       A:     I don't know for sure if I said that or not, but I know I
  didn't go in her.

26 / / /

As to semen found on a penile swab taken from petitioner the morning of the incident, petitioner

testified as follows:

> Q:      Can you explain for us why it is that there was semen found
> on your penile swab?
>
> A:      Because when you get hot, you know – you're a man, right?
> You ever get horny and come comes out of you?  That's just natural.
> That's how mine was doing.

A review of the trial transcript shows that Mr. Lippsmeyer argued on closing that

the victim was a prostitute and consented to sex with petitioner.  The record also shows that the

jury was specifically instructed that lack of consent is an element of rape.  Specifically, as to

consent and mistaken belief in consent, the trial court instructed the jury as follows:

> Against such person's will means without the consent of the
> alleged victim.
>
> * * *
>
> . . . There is no criminal intent if the Defendant had a reasonable
> and good faith belief that the female person voluntarily consented to
> engage in sexual intercourse.

3.      Mr. Lippsmeyer's Deposition Testimony

With regards to trial counsel's performance, petitioner requested an evidentiary

hearing.  In lieu of an evidentiary hearing, however, the court granted petitioner's counsel leave

to take Mr. Lippsmeyer's deposition.  A review of the transcript reveals that the following

exchange took place at the deposition on questioning by petitioner's counsel:

> Q:      And the question is, why did you not order DNA testing?
> Why did you not have those vaginal swabs tested by standard set forth at
> the time for DNA?
>
> A:      Because it was not standards set forth at the time, so far as I
> knew, because the defense was basically consent.  And I believed it to be
> consent.  Because, if nothing else, I may have maybe not argues it, you
> know, the Ann Landers, you know, don't do the heavy petting because
> you're going to end up with semen in someplace.  And even if you don't
> have sexual intercourse, you can produce a baby type of thing.  And I
> know that – for whatever reason that just came back to me, Ann Landers,

you know, in an advice column, don't do any heavy petting, kids, because you never know. . . .

The fact that there is semen in there really didn't make any difference to me in terms of penetration.  It seems to me, if I remember right, that, you know, she's telling he's having sexual intercourse with me, et cetera, and she's had sexual intercourse with somebody.  And he's saying, "I'm consenting.". . .

Plus, at the time DNA testing wasn't a big thing, it wasn't something that where I felt we had to have an expert.  But basically I was looking at this case as always a consent case.

Q:     Consent to do what?

A:      To have sexual intercourse and to exchange fluids in some way or another, his bodily fluids.  And I figured they were his.  That much I know.

Regarding his statements to Mr. Blasier, Mr. Lippsmeyer testified as follows:

Q:     Why did you tell Bob Blasier that DNA testing would have been appropriate to do in this case? . . .

A:     I don't know that I did.  Did I?

*  *  *

Q:     You said it was – it would not have been appropriate.  Why would it not have been appropriate?

A:     . . . [¶] In this case because the defense is and was and I thought it was consent or mistaken belief in consent, then it would be counterproductive.  It wouldn't prove anything.  And it may be confirmatory and – of what they have said.

While it appears Mr. Lippsmeyer provided somewhat contradictory statements to Mr. Blasier, the court nonetheless concludes that Mr. Lippsmeyer's deposition testimony is credible.  The deposition testimony, unlike statements made to Mr. Blasier, was subject to cross-examination by respondent's counsel.  On cross-examination, Mr. Lippsmeyer testified:

Q:     My next question is, your defense at trial was consent and his perhaps mistaken belief in her consent.

A:     That's what I think it is.  I don't – you know, I haven't looked at the instructions.  I haven't looked at the trial.  I don't know what my closing argument was.  But that's what I remember from 10 years ago or 12 years ago or whatever it was.  11.

> And for that defense I don't know that DNA had any application. So if I said to Bob Blasier yes, certainly be a good idea to have DNA, I'm sure it would be in every case.   But I didn't think of it at the time.   And I may be incompetent for not thinking of it, but I don't think so.

It is clear to the court that the defense was, as Mr. Lippsmeyer testified at his deposition, based on consent and not lack of penetration.  While there was a discussion at trial regarding penetration and petitioner's story that no penetration ever occurred, this was in the context of petitioner's statement of what happened and not presented as a specific defense at trial.  The record does not reflect that trial counsel argued to the jury that, because no penetration of any kind occurred, petitioner cannot be guilty of rape.

Regardless of whether Mr. Lippsmeyer's deposition testimony was impeached by a prior inconsistent statement to Mr. Blasier, Mr. Lippsmeyer's deposition testimony is supported by the trial record.  Therefore, as between Mr. Lippsmeyer's statement to Mr. Blasier and his deposition testimony, the court finds that the deposition testimony is more credible.

### 4.   Request for Leave to Take Mr. Blasier's Deposition

Petitioner also requests leave to take Mr. Blasier's deposition in order to impeach Mr. Lippsmeyer's deposition testimony.  As discussed above, the court does not find that Mr. Lippsmeyer's statements to Mr. Blasier discredit his deposition testimony, which is supported by the record.  Therefore, there is no need to take Mr. Blasier's deposition for this purpose.  To the extent petitioner seeks to offer Mr. Blasier's deposition testimony for the fact of the matters stated to him by Mr. Lippsmeyer, Mr. Blasier's testimony would be hearsay.  The court is satisfied that Mr. Lippsmeyer's deposition testimony, which was subject to cross-examination, accurately reflects the nature of the defense he presented at trial.

///

///

///

///

### III.  STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner).  When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

1       Under § 2254(d), federal habeas relief is available where the state court's decision

2   is "contrary to" or represents an "unreasonable application of" clearly established law.  In

3   Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the

4   Court), the United States Supreme Court explained these different standards.  A state court

5   decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme

6   Court on the same question of law, or if the state court decides the case differently than the

7   Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state court

8   decision is also "contrary to" established law if it applies a rule which contradicts the governing

9   law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate that

10  Supreme Court precedent requires a contrary outcome because the state court applied the wrong

11  legal rules.  Thus, a state court decision applying the correct legal rule from Supreme Court cases

12  to the facts of a particular case is not reviewed under the "contrary to" standard.  See id. at 406.

13  If a state court decision is "contrary to" clearly established law, it is reviewed to determine first

14  whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040, 1052 n.6 (9th

15  Cir. 2002).  If so, the next question is whether such error was structural, in which case federal

16  habeas relief is warranted.  See id.  If the error was not structural, the final question is whether

17  the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

18      State court decisions are reviewed under the far more deferential "unreasonable

19  application of" standard where it identifies the correct legal rule from Supreme Court cases, but

20  unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith,

21  123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams,

22  suggested that federal habeas relief may be available under this standard where the state court

23  either unreasonably extends a legal principle to a new context where it should not apply, or

24  unreasonably refuses to extend that principle to a new context where it should apply.  See

25  Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

26  decision is not an "unreasonable application of" controlling law simply because it is an erroneous

1  or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 123 S.Ct.

2  1166, 1175 (2003).  An "unreasonable application of" controlling law cannot necessarily be

3  found even where the federal habeas court concludes that the state court decision is clearly

4  erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear error fails to

5  give proper deference to state courts by conflating error (even clear error) with

6  unreasonableness."  Id.  As with state court decisions which are "contrary to" established federal

7  law, where a state court decision is an "unreasonable application of" controlling law, federal

8  habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn,

9  283 F.3d at 1052 n.6.

10         The "unreasonable application of" standard also applies where the state court

11 denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

12 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions

13 are considered adjudications on the merits and are, therefore, entitled to deference under the

14 AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

15 The federal habeas court assumes that state court applied the correct law and analyzes whether

16 the state court's summary denial was based on an objectively unreasonable application of that

17 law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

18

19                          **IV.  DISCUSSION**

20         Petitioner raises one claim.  He argues that his trial counsel – Jon Lippsmeyer –

21 was ineffective for failing to conduct DNA testing of the physical evidence.

22         The Sixth Amendment guarantees the effective assistance of counsel.  The United

23 States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

24 Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering

25 all the circumstances, counsel's performance fell below an objective standard of reasonableness.

26 See id. at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to

14

have been the result of reasonable professional judgment.  See id. at 690.  The federal court must

then determine whether, in light of all the circumstances, the identified acts or omissions were

outside the wide range of professional competent assistance.  See id.  In making this

determination, however, there is a strong presumption "that counsel's conduct was within the

wide range of reasonable assistance, and that he exercised acceptable professional judgment in all

significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

Strickland, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S.

at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.;

see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

determine whether counsel's performance was deficient before examining the prejudice suffered

by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an

ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at

697).

Petitioner, through appointed counsel, argues:

> For multiple reasons, trial counsel's failure to thoroughly
> investigate the biological evidence was constitutionally deficient.  First,
> challenging the state's forensic case was critical to petitioner's defense.
> Other than creating a reasonable doubt that he had not had sex with the
> victim, petitioner's only defense was that "someone else did" – a defense
> that is often difficult to mount and fraught with evidentiary problems, as
> trial counsel's efforts proved.  Much, if not all, of petitioner's defense,
> therefore, depended on trial counsel's ability to convince the jurors that the
> state's experts were wrong in concluding the relationship of their evidence
> to petitioner. . . .
>
> Second, the biological evidence was the cornerstone of the state's
> case, given the truculent nature of the victim, and her obvious
> unbelievability.  The state had little evidence beyond it.  Trial counsel had
> to have understood this.  Yet he failed to conduct a thorough investigation
> into the most crucial aspect of the state's case. . . .

15

1
2
3
4

> Third, trial counsel acknowledged that he lacked any explanation for failing to conduct DNA testing, knowing that if it confirmed petitioner's statement that he had not had intercourse with the victim it would have been very strong exculpatory evidence. . . .
>
> Taken together, these circumstances demonstrate the trial counsel's deficient performance, denying petitioner's his Sixth Amendment right to effective assistance of counsel, for failing to do so.

5   As Mr. Blasier notes, DNA evidence could have been determinative in this case on

6   the issue of whether the semen found was from petitioner.  The victim's story was that petitioner

7   raped her.  Thus, by definition, the victim claims that petitioner penetrated her with his penis.

8   Also, according to the victim, the semen found in her vagina was from petitioner and resulted

9   from this penetration and subsequent ejaculation.  The victim supported this version of events by

10  testifying that she had not had intercourse with anyone else during the 72 hours prior to the

11  incident with petitioner.  Petitioner's version, however, is that he never penetrated the victim and

12  that he was wearing his underwear the entire time.  Mr. Blasier states in his report that petitioner

13  told him that "[he] took off his pants, but never removed his underwear or exposed his penis" and

14  that ". . . he did not penetrate her."  This is consistent with petitioner's trial testimony.

15  There are two ways of looking at the DNA/semen issue depending on what theory

16  the defense argued at trial.  On the one hand, if petitioner's defense at trial was that there was no

17  possible way for the semen to be his because he never had any kind of sexual contact with the

18  victim, then DNA testing could have conclusively established whether the semen was petitioner's

19  and, consequently, whether this defense had merit.   On the other hand, if petitioner's defense was

20  that the victim consented to sex – perhaps because she was a prostitute – then the presence of

21  petitioner's semen in the victim's vagina would not have made any legal difference.  Either the

22  jury was going to believe in the consent theory or not.

23  While the court accepts Mr. Blasier's account that Mr. Lippsmeyer informed him

24  that he had no explanation for not conducting DNA testing prior to trial, the court also accepts Mr.

25  Lippsmeyer's February 13, 2008, deposition testimony that the defense case was based on

26  consent.  This testimony is supported by the trial record.  In his deposition testimony, counsel

1   made clear that DNA testing was not conducted because it was not relevant to the consent

2   defense.  Contrary to habeas counsel's characterization of Mr. Blasier's report that the defense

3   was based on lack of penetration required to complete the crime of rape, Mr. Blasier reported that

4   the defense was based on the victim lying and that DNA testing would have confirmed who was

5   telling the truth.  However, as mentioned above, it is not clear whether Mr. Blasier thought the

6   victim was lying about consent or penetration.  Focusing on consent – the defense presented at

7   trial – DNA testing would not necessarily have established whether the victim was telling the

8   truth regarding consent.  If the victim consented, the semen could be from petitioner.  If she didn't

9   consent, the semen could still be from petitioner.  Whether there was consent to do an act has no

10  bearing on whether the act was actually committed.

11          The presence or absence of petitioner's semen also is not dispositive of the issue of

12  penetration, as habeas counsel argues.  It is clear that petitioner believed that sexual activity while

13  he was still wearing his underwear, which may or may not have included ejaculation, constituted

14  "sex."[4]  This was an argument made by trial counsel.  As to the presence of petitioner's semen in

15  the victim, it is possible and consistent with petitioner's understanding of "sex" that, while he did

16  not remove his underwear, he did ejaculate and that some of this semen went through his

17  underwear and ended up inside the victim.  It is also possible that he did not ejaculate but that,

18

19

_____

20          [4]      As an aside regarding petitioner's testimony, the court does not accept
respondent's argument that this testimony shows an inconsistency between petitioner's
21  statements because it is clear that petitioner's understanding of "sex" does not necessarily
involve vaginal penetration.  It should be noted at this point that petitioner is mentally retarded
22  and that the parties do not dispute this fact.  Therefore, with this in mind, it appears that
petitioner's statement to the detective regarding having had "sex" with the victim was clarified –
23  not contradicted – on cross-examination to mean "going up and down on top . . ." of petitioner
while he was still wearing his underwear.  Further, while petitioner answered "Yeah" to the
24  detective's question, it is not clear whether this affirmative response related to the first part of the
question or the second.  The detective asked:  "When you put your penis in her vagina, did you
25  have a full erection."  Petitioner's "Yeah" could mean that he admitted that he put his penis in
the victim or merely that he admitted to having had a full erection during the encounter.  What is
26  clear is that petitioner believed that what he and the victim were doing constituted sex.

1    nonetheless, some semen discharged from petitioner's penis and went through his underwear.[5]  In

2    fact, this also was part of trial counsel's theory in closing argument, in which he argued both

3    consent and the "Ann Landers" theory.  Thus, penetration is not required to explain the presence

4    of petitioner's semen in the victim.  Nor is the absence of semen dispositive on the issue of

5    penetration if, as petitioner states, he never ejaculated in the victim.  In other words, penetration

6    could have occurred whether or not the semen found was petitioner's.  It was up to the jury to

7    decide whether to believe petitioner's testimony that he never penetrated the victim or the victim's

8    testimony that he did.  DNA evidence would not have been dispositive..

9            For all of the foregoing reasons, the court concludes that trial counsel's

10   performance was not deficient with respect to DNA testing.  At best, DNA evidence in this case

11   would have, as Mr. Blasier suggests, impeached the victim's testimony.  Specifically, if the semen

12   found in the victim was not from petitioner, the victim's statement that she did not have

13   intercourse with anyone else during the 72 hours preceding her encounter with petitioner would

14   tend to be discredited.  The failure of counsel to seek DNA testing for this purpose, however, does

15   not undermine this court's confidence in the outcome of the trial such that a finding of ineffective

16   assistance of counsel can be made.  The question of the victim's credibility was a matter for the

17   jury and counsel did in fact present other arguments that she was not credible.  Further, it is

18   possible that, even if DNA evidence established that the semen was not from petitioner, the jury

19   could still have chosen to believe the victim's somewhat impeached testimony that she was raped.

20   This court cannot say that, but for impeachment via DNA evidence, the outcome of the trial would

21   have been different.  Therefore, even assuming counsel's performance was deficient with respect

22   to obtaining DNA evidence to impeach the victim's testimony, there was no prejudice.

23

24          [5]     Mr. Blasier's statement in his report that any semen would have remained in
     petitioner's underwear is not supported by any evidence presented at trial.  Nor is there any
25   evidence in the record to suggest that this possibility is foreclosed by the amounts of semen
     found in the victim.  While the evidence is clear that semen was found, there is no indication of
26   amount.

### V.  CONCLUSION

Because the California Supreme Court denied petitioner's claim of ineffective assistance of counsel without comment or citation, this court reviews under the "unreasonable application of" standard.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.  Under this standard, the court cannot say that the state court's denial was an unreasonable application of the Strickland test for ineffective assistance of counsel.  The record, which includes Mr. Lippsmeyer's deposition testimony, reflects that the defense was based on consent and the court finds that DNA testing would not have made any difference.  Either the jury was going to believe petitioner's version of events based on his understanding of "sex" or not.  Counsel's performance did not fall below the Strickland standard with respect to DNA testing.  Additionally, to the extent petitioner's counsel was ineffective for failing to obtain DNA evidence to impeach the victim's testimony, there was no prejudice.

Based on the foregoing, the undersigned recommends that:

1.      Petitioner's petition for a writ of habeas corpus be denied;

2.      All pending motions be denied as moot; and

3.      The Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  February 29, 2008

_Craig M. Kellison_
CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE